UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MICHELLE ARYELLAH JOHNSON,

               Plaintiff,

      v.                                          Case No. 3:13-cv-2144-ST

TRAVIS ELTON, TROY BECNEL, and         FINDINGS AND
JOSH JONES,                           RECOMMENDATIONS

               Defendants.

STEWART, Magistrate Judge:

      Plaintiff, Michelle Aryellah Johnson ("Johnson"), appearing *pro se*, filed a Complaint

against three officers of the The Dalles police department, Travis Elton ("Elton"), Troy Becnel

("Becnel"), and Josh Jones ("Jones") (docket #2) and applied to proceed *in forma pauperis*

(docket #1).  On January 16, 2014, this court granted Johnson leave to proceed *in forma pauperis*

and dismissed her[1] Complaint for failure to state a claim and with leave to file an amended

complaint.  Order adopting Findings and Recommendations (docket #11).  Johnson filed an

Amended Complaint (docket #9) again alleging three claims for relief against Elton, Becnel, and

---

[1] Johnson has used aliases that are both male and female names.  Because Johnson refers to herself with feminine personal pronouns, this court will do the same.

Jones which are now the subject of defendants' Motion for Summary Judgment (docket #39).

Johnson then filed a Motion to Strike Defendants' Motion for Summary Judgment and for

Sanctions for Fraud on the Court (docket #55), requesting that defendants' motion be stricken

and that this court issue a writ of *habeas corpus* and impose monetary sanctions, all premised

upon Johnson's assertion that defendants' counsel submitted perjured affidavits and other

materials to this court.  For the reasons that follow, Johnson's motion should be denied,

defendants' motion should be granted, and this case should be dismissed with prejudice.

## <u>STANDARDS</u>

Summary judgment may be granted if "no genuine issue" exists regarding any material

fact and "the moving party is entitled to judgment as a matter of law."  FRCP 56(c).  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only determine[] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989)

(citation omitted).  The substantive law governing a claim or defense determines whether a fact

is material.  *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted).

The court must view the inferences drawn from the facts "in the light most favorable to the non-

moving party."  *Bravo v. City of Santa Maria*, 665 F3d 1076, 1083 (9th Cir 2011) (citations

omitted).

## FINDINGS

### I. Facts

#### A. Background

Johnson's Amended Complaint is as difficult to decipher as her initial Complaint. As a basis for jurisdiction, Johnson again checks the box on the form designating federal question jurisdiction and then lists the following statues as the basis for that jurisdiction: 42 USC § 1983, 42 USC § 1985, the Americans with Disability Act, 42 USC §§ 12101-12213 ("ADA"), the Rehabilitation Act of 1973, 29 USC § 794, and the First, Fourth, and Fifth Amendments to the United States Constitution. Amended Complaint, ¶ II.B.

As explained in this court's prior opinion, Johnson alleges that, by conspiring against and eventually arresting her, defendants violated various legal rights and guarantees. The initial Complaint, in part, sought declaratory relief that the judgment and conviction in a criminal case was unconstitutional. Johnson no longer explicitly seeks that particular relief, but instead seeks declaratory relief that defendants' conduct violated her constitutional rights.

The State of Oregon's Offender Search database indicates that Howard Martin Johnson, who is currently on probation, uses a number of aliases, including the names "Michelle Johnson" and "John Mauritz Hummasti." In late 2006, John Mauritz Hummasti filed a case in this court, *Hummasti v. Ali, et al.*, Civil No. 3:06-cv-01710-BR, against various defendants alleging various constitutional claims. In that case, Johnson (a.k.a. John Mauritz Hummasti, a.k.a. Howard M. Johnson, Jr.) filed a motion for a protective order "to allow Plaintiff's 'Safe Passage and Return' to and from the State of Israel, via the Consulate Generals' office in Los Angeles, CA" (docket #166). That motion was denied on August 20, 2012 (docket #168).

On August 25, 2012, five days after that motion was denied, Johnson was arrested. That arrest, and some brief encounters with defendants that preceded it, form the basis of the claims alleged in the Amended Complaint in this case.

### B. August 2012 Interactions Between Johnson and Defendants

In August 2012, Johnson lived in an apartment in The Dalles, Oregon, with Karrie Elizabeth Swearingen ("Swearingen"). Each of the three defendants are police officers with The Dalles Police Department. Between August 6 and 15, 2012, defendants had varying degrees of contact with Johnson and Swearingen: (1) two 911 calls by Johnson on August 6, 2012, reporting a verbal argument with Swearingen which resulted in Elton warning Johnson that improper use of 911 was a crime (Elton Decl., ¶¶ 2-3); (2) reports to police by neighbors on August 7 and 15, 2012, of people "screaming at one another" which resulted in Becnel (on August 7) and Jones (on August 15) responding to the apartment, encountering Swearingen and Johnson, and either counseling them about disturbing the peace and abusing 911 based on the multiple 911 calls where there was no discernable crime (Becnel Decl, ¶ 2) or taking no action due to the lack of criminal conduct (Jones Decl., ¶ 2); and (3) a call to police by Swearingen on August 12, 2012, reporting that her husband (identified as Howard Martin Johnson) was missing which ultimately resulted in no action because Johnson was later found (Becnel Decl., ¶¶ 3-4).

A few weeks later on August 25, 2012, Swearingen called police and reported that Johnson was causing a disturbance. Elton Decl., ¶ 4. This disturbance apparently started when Johnson arrived home from a trip and discovered that many of her personal belongings were up for grabs in a yard sale orchestrated by Swearingen. Plaintiff's Sworn Decl. (docket #19), ¶ 10. Loudly enough for yard-sale customers to overhear, Johnson told Swearingen that it was illegal for Swearingen to take away Johnson's livelihood by selling her tools. *Id*. A physical

confrontation involving Swearingen, Swearingen's cousin, Kathleen Hanthorn ("Hanthorn"), and Johnson ensued. At this point, the story, as told by Johnson, diverges from that told by defendant Elton.

### 1. **Elton's Version**

According to Elton, when he arrived on scene, he observed Johnson "assaulting" Swearingen and observed Swearingen and Hanthorn fall down the steps. Elton Decl., ¶ 4. Johnson then told Elton she was leaving, but Elton told Johnson she was not free to leave as a crime may have occurred based on the 911 call and his own observations. *Id*. When Elton instructed Johnson to put her hands behind her back to be handcuffed, Johnson "pulled away" from Elton, turned around and grabbed the handcuffs, holding them "out like a weapon, as the handcuffs were open." *Id*, ¶ 5.

Elton drew his Taser and ordered Johnson to drop the handcuffs, but Johnson "backed away, closed h[er] fist, and bladed [her]body toward [Elton]." *Id*. After Elton repeated his instruction to drop the handcuffs, Johnson responded by placing the handcuffs in her pants pocket. *Id*. After Elton instructed her to put the handcuffs on the ground, Johnson pulled the handcuffs out of her pocket and threw them down the street. *Id*. When Elton again reached out to take Johnson's arm and cuff her, Johnson struck Elton in the face. *Id*, ¶ 6. Elton then "wrestled" Johnson to the ground, injuring both of his elbows in the process. *Id*, ¶ 7. With the help of Hanthorn and another police officer who arrived on the scene, Elton subdued Johnson and placed her in handcuffs. *Id*. The Dalles Police Chief, Jay Waterbury, sent Elton to the Mid-Columbia Medical Center for treatment of his face and right elbow and wrist. *Id*, ¶ 8.

### 2. **Johnson's Version**

In contrast, Johnson states that Hanthorn pushed both Swearingen and Johnson down the stairs in a struggle over the keys to Johnson's Mercedes Benz.  Plaintiff's Sworn Decl., ¶ 11. Hanthorn then jumped on top of Johnson and held her down until Johnson was physically "picked up onto [her] feet and thrown into the street" by someone Johnson later learned was Elton.  *Id.*  Thinking this person was Swearingen's "biker step brother" who had previously threatened to take Johnson "out into the woods for target practice," Johnson "pulled out a pair of handcuffs [she] found in the headboard of the bed . . . which Swearingen had hidden."  *Id*, ¶ 12. Because she had previously suffered assaults by correctional officers brandishing handcuffs, Johnson turned and threw the handcuffs down the street behind her.  *Id*, ¶ 13.  Johnson "resisted being assaulted" as she feared for her life if she were put in jail due to death threats against her. *Id.*  After Johnson was placed in the patrol car, she heard Swearingen tell the officers that Johnson was "crazy."  *Id*, ¶ 14.

### C. **Criminal Charges**

Johnson was arrested and charged with Assaulting a Public Safety Officer, Resisting Arrest, Robbery III, Assault IV (Domestic Violence), Harassment, and Disorderly Conduct II. Elton Decl., ¶ 9.  On September 13, 2012, Johnson pled No Contest to Assaulting a Public Safety Officer and Assault IV (Domestic Violence).  Warren Decl., Ex. 1.  The remaining four charges were dismissed, and Johnson was sentenced to 30 days in jail and 36 months of Supervised Probation on the Assaulting a Public Safety Officer conviction, with revocation of supervision to result in an 18-month jail sentence.  *Id*.  She was also sentenced to 365 days in jail on the Assault IV conviction, suspended on the condition that she comply with probation, to run concurrently with the other sentence in the event her supervision is revoked.  *Id*.  Johnson appealed the two

assault convictions, but the Oregon Court of Appeals affirmed without opinion and on December 11, 2014, the Oregon Supreme Court denied Johnson's petition for review. *State v. Howard Martin Johnson, Jr.*, Wasco County Circuit Court Case No. C-1200227, *aff'd without opinion*, 265 Or App 224, 334 P3d 483 (Or App Aug. 20, 2014) (Table No. A153245), *petition for review denied*, (Dec. 11, 2014).

## II. __Johnson's Submissions__

Johnson's submissions are lengthy and rambling, but tell a story that begins in Israel. Johnson claims she was married (while gender-identified as male) to "Grace (Hala) Bassem Farah under a Jewish contract of marriage" and that, while married, "applied for Asylum or Refugee status as an interna[tion]ally displaced person with the State of Israel on 22 August 2004" and that she did so "under the Israeli Law of Return." Plaintiff's Sworn Decl., ¶ 1. As grounds for requesting that status, Johnson claims that she has cooperated with certain United States Department of Homeland Security authorities in certain investigations and that, as a result, has received death threats. *Id.* Johnson also avers that she was diagnosed with Gender Identity Disorder in 1999 and with a variety of other issues, including Post-Traumatic Stress Disorder, Seizure Disorder, and Adult Attention Deficit Disorder. *Id*, ¶ 3.

Johnson claims that her "Israeli spouse, Grace Bassem (Hala) Farah" was on the staff of the former Mayor of Jerusalem and that she (Johnson) engaged in "trade agreement discussions" with two former Prime Ministers of Israel (Ehud Olmert ("Olmert") and Benjamin Netanyahu) and Olmert's assistant, Shofan Doron, thereby gaining entitlement to immunity under the Geneva Convention. Plaintiff's Statement of Disputed Facts and Reply to Defendants' Opposition (docket #66), p. 8. She also contends that she has been engaged in "interdiction work" since the early 1980's involving "narcotics, arms, [and] bio-terrorism/anti-terrorism." *Id.*

Immediately prior to her encounter with defendants in August 2012, Johnson was both pursuing an award of Supplemental Security Income ("SSI") (apparently granted September 13, 2012) and in contact with various Israeli consular officials, as well as the offices of both the Prime Minister and the Vice (Deputy) Prime Minister of Israel.  Plaintiff's Sworn Decl., ¶¶ 4-5. The conversations with Israeli officials were apparently efforts to "obtain a government contract with the State of Israel and the Oregon National Guard to build a nuclear fall-out shelter and community college in Nazareth, Israel, on property owned by Johnson's in-laws.  *Id*, ¶ 8.

Based on this history, Johnson explains that she was and is entitled to "immunity" from arrest, detention and prosecution as an "internationally protected person."  Memorandum of Law: Immunity from Arrest and Detention (docket #56), p. 1.  This alleged immunity is premised upon her status as an Ordained Rabbi of the Jewish Community.  *Id*.  After a lengthy discussion of universal and territorial jurisdiction, Johnson claims she was never "told that she was 'under arrest'" and seems to contend that defendants knew her arrest was unlawful and, therefore, were prevented from using any physical force in arresting her.  *Id*, pp. 5-6.

Johnson repeatedly characterizes Swearingen as an abuser who should have been arrested, while characterizing herself as entitled to immunity.  In particular, Johnson submits records from the "Nez Perce County Sheriff's Wanted List" that names Swearingen.  Johnson asserts that Swearingen falsely told Elton and Becnel that Johnson was mentally ill and delusional, and reported Johnson as a missing person knowing full well that Johnson was in Portland for a hearing on her application for SSI.  As a result of that police contact, Johnson asserts that Swearingen hatched a plan to have Johnson civilly committed and thereby pave the way to sell Johnson's Mercedes Benz to the officers.  Plaintiff's Sworn Decl., ¶ 5.

///

8 - FINDINGS AND RECOMMENDATIONS

### III. **Johnson's Amended Claims**

None of the three claims in the Amended Complaint specifies the statutory or constitutional provision on which it is based, although each specifies that it has its genesis in a conspiracy between defendants and Swearingen. Swearingen and Johnson apparently lived together but, by early August 2012, had developed a contentious enough relationship that both they and their neighbors began to contact police. A comparison of the theory underlying each claim and the evidence actually in the record reveals that none of these claims had sufficient factual support to proceed.

### A. **Claim I**

In Claim I, Johnson alleges that defendants conspired with Swearingen to unlawfully arrest or civilly commit Johnson, all in an effort to prevent Johnson from traveling to Los Angeles and Israel to obtain sex reassignment surgery. That surgery was available to her after "being granted an Oleh's Certificate under the Law of Return or alternatively available to [her] upon her testifying against Robert Steven Manning in the Alex Odeh domestic bombing/murder case and [Johnson] collecting the one million dollars reward in that active bombing/murder case." Amended Complaint, p. 3. Johnson sues the individual defendants in their individual capacities for "failure to protect [her] because she is Jewish." *Id*.

Johnson apparently is attempting to state a claim against defendants based on violations of 42 USC § 1981 or § 1985. However, it is far from evident that Johnson can plead the elements necessary to state any such claim. Although § 1981 does not itself use the term "race," it is intended and has been interpreted to prohibit race discrimination. *Keating v. Carey*, 706 F2d 377, 384 (2nd Cir 1983) (noting that § 1981 was enacted in an effort to address the problem of

racial discrimination against African-Americans).  To establish a § 1985 claim, a plaintiff must

prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Sever v. Alaska Pulp Corp.*, 978 F2d 1529, 1536 (9th Cir 1992) (citation omitted).

In the Ninth Circuit, the plaintiff must also establish "a deprivation of [the protected right

which was] motivated by 'some racial, or perhaps otherwise class-based, invidiously

discriminatory animus.'"  *Id*, quoting *Griffin v. Breckenridge*, 403 US 88, 102 (1971).  Mere

allegations of a conspiracy unsupported by admissible evidence are insufficient to establish a

claim.  *See, e.g., Karim-Panahi v. Los Angeles Police Dept.*, 839 F2d 621, 626-24 (9th Cir 1988).

"The absence of a section 1983 deprivation of rights precludes a section 1985 conspiracy claim

predicated on the same allegations."  *Caldeira v. Cnty. of Kauai*, 866 F2d 1175, 1182 (9th Cir

1988), *cert. denied*, 493 US 817 (1989) (citation omitted).

Among other things, Claim I hinges on proof that Johnson's arrest was both unlawful and

the result of class-based animus.  The only allegation in Johnson's newly-alleged Claim I hinting

at racial animus is the allegation that defendants failed to protect Johnson because she is Jewish.

In her own recounting of the August 25, 2012 encounter with Elton, Johnson contends that she

told the officers (presumably Elton and Parsons, an officer who arrived on scene and helped

subdue Johnson (Elton Decl., ¶ 7)) that she had been an emissary to the United Nations and

volunteered to monitor Hezbollah terrorism on behalf of the United States and Israel.  Plaintiff's

Sworn Decl., ¶ 15.  She also told them that the Israeli Consulate told her to tell defendants that

they could not ignore her requests for assistance due to domestic violence, to which defendants responded that they did not take orders from her or the Israeli Consulate. *Id*, ¶ 19.

The difficulty with this claim is that, by all accounts, including Johnson's, Elton had probable cause to arrest her. Johnson admits she was engaged in a physical altercation when Elton arrived on the scene, admits she wielded handcuffs then threw them down the street when ordered to put them down, then "resisted being assaulted," presumably by striking Elton (the only defendant involved in the August 25, 2012 encounter) in the face. The fact that Johnson may have had a legitimate explanation for her presence at the apartment, namely collecting her possessions in order to put them in storage (Plaintiff's Sworn Decl., ¶ 19), does not transform her arrest into one without probable cause. Similarly, her post-arrest statements about her connection to Israel does not transform the officers' actions in subduing her into anti-Semitic conduct. She has offered nothing save her own speculation that any of the defendants knew she was Jewish prior to her arrest, much less that Elton decided to arrest her on that basis on August 25, 2012, or engaged in a conspiracy to have her civilly committed and dupe her out of her Mercedes Benz. Beyond the mere allegation of a conspiracy, Johnson has failed to submit anything to establish a basis to reasonably conclude that defendants' actions were motivated by some racial class-based animus.

### B.  Claim II

Claim II alleges that defendants conspired with Swearingen to deprive Johnson of her right to be "secure in her person, property, papers and effects" by failing to protect her from mental and physical abuse by Swearingen, a "wanted felon . . . convicted of domestic violence in Clatsop County, Oregon." Amended Complaint, p. 4. Johnson allegedly reported abuse at Swearingen's hands to Jones by email on August 24, 2012. *Id*. Nevertheless, defendants

allegedly failed to prevent the abuse, failed or refused to have Swearingen arrested, allegedly because Swearingen "promised to sell Defendants Elson or Bechnel [Johnson's] 1984 Mercedes Benz at a low price" in exchange for not arresting Swearingen. *Id*. Again Johnson alleges that her arrest was without probable cause and designed to prevent her from traveling to Los Angeles and Israel, which deprived her of her right "to enforce the obligation of a Jewish marriage contract." *Id*. The gist of this claim seems to be that the calls to police prior to August 25, 2012, both by Johnson and her neighbors, should have alerted defendants both of Johnson's status as a "vulnerable person with disabilities" and of Swearingen's status as a wanted felon and domestic abuser. Armed with that knowledge, Johnson alleges that defendants had a duty to protect her from Swearingen.

Viewed in the light most favorable to Johnson, the evidence reveals that defendants responded to multiple 911 calls made by Johnson and Swearingen, and only became involved in an altercation with and arrest of Johnson when she appeared to be involved in criminal conduct, namely the assault against Swearingen witnessed by Elton. At his earliest encounter with Johnson and Swearingen, Elton noted "possible mental issues on both sides." Elton Decl., Ex. 1, p. 1. Elton attempted to put Johnson in contact with a rabbi at the Portland Police Bureau who wanted to assist Johnson, and Elton warned Johnson that making calls made absent any emergency constitutes improper use of the 911 system. *Id*, Ex. 2, p. 1. While Johnson appears to have a long history with Israeli officials and citizens, nothing in the record indicates that defendants knew of that history, knew anything about Johnson's background, or knew of Johnson's various agreements to assist in international anti-terrorism efforts, much less that Elton arrested Johnson on August 25, 2012, based on any such information or on a conspiracy with Swearingen.

12 - FINDINGS AND RECOMMENDATIONS

Johnson seems to be under the impression that the police had a duty to protect her from Swearingen and that the failure to protect her can provide a basis for a civil rights claim. That is simply not so, even when the claim is couched in constitutional language:

> [N]othing in the Due Process Clause itself requires the state to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause itself is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 US 189, 195 (1989).

Substituting the language of the Fourth Amendment, rather than the Due Process Clause, does not give any better traction to Johnson's assertion that Elton should have protected her from, and arrested, Swearingen. The inquiry in a Fourth Amendment claim is whether the officer's actions were:

> "objectively reasonable" in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively reasonable use of force constitutional.

*Graham v. Connor*, 490 US 386, 397 (1989) (internal citations omitted).

Even viewed in the light most favorable to Johnson, defendants' actions, including Elton's arrest of Johnson, can only be characterized as an objectively reasonable and measured response to their multiple contacts with Johnson. Johnson's claim, even insofar as alleged against Elton, is not styled as a classic excessive force claim nor expressly raises that issue despite using language of the Fourth Amendment. She does characterize the manner in which

she was apprehended by Elton for handcuffing as being "body slammed onto the street." Plaintiff's Sworn Decl., ¶ 13.  However, even she notes that this takedown occurred after she brandished handcuffs at someone she recognized as a police officer.  *Id*, ¶ 12.  Nothing about this description, or any of the other descriptions of the encounter in the record, takes it out of the realm of objectively reasonable conduct.

### C. Claim III

Claim III alleges that from August 1 to 25, 2012, defendants deprived Johnson of her right "to enforce the obligation of a Jewish marriage contract" by arresting her without probable cause.  Amended Complaint, p. 4.  She also alleges that Elton threatened to arrest her for abusing 911, allegedly in  retaliation for Johnson threatening to sue Elton and Becnel for "unlawfully" taking Johnson's car titles, proof of registration, and proof of insurance.  *Id*.

Again Johnson does not state what law has allegedly been violated by the conspiracy. Johnson does not identify any law, much less a federal law, which grants her a right "to enforce the obligation of a Jewish marriage contract."  Thus, it is difficult to discern how her arrest by defendants interfering with that right constitutes a violation of her civil rights.

## IV. Remaining Issues

### A. Interference with Travel

Among others, one thrust of Johnson's various submissions seems to be that defendants improperly interfered with her right to travel which, in turn, improperly interfered with her right to obtain a divorce in Israel.  This contention has no merit.  Again, viewed in the light most favorable to Johnson, the record does not support the conclusion that Johnson was arrested without probable cause.  Moreover, allowing Johnson's claim of an unlawful arrest to proceed would undermine Johnson's state court criminal convictions in violation of *Heck v. Humphrey*,

512 US 477 (1994).  An arrest and jail time certainly interferes with the right to travel and may prevent undertaking other activities that require travel, such as obtaining a divorce overseas as alleged by Johnson.  However, the constitutional right to travel is a conditional liberty that may be "legally extinguished by a valid conviction followed by imprisonment."  *Bagley v. Harvey*, 718 F2d 921, 924 (9th Cir 1983).  Thus, any notion that Johnson may proceed on the theory that her arrest interfered with her constitutional right to travel should be rejected.

**B.  Qualified Immunity**

The record also reveals that defendants are entitled to qualified immunity for any alleged constitutional violations.  Defendants responded to repeated 911 calls from Johnson, Swearingen and their neighbors by trying to put Johnson in contact with someone who could help and by counseling her against making baseless 911 calls.  Finally, on August 25, 2012, Elton arrested Johnson based on what he viewed as an assault in progress against Swearingen, and Johnson's subsequent brandishing of a pair of open handcuffs and hitting of Elton.  Notwithstanding Johnson's citation to a string of state and federal statutes, pronouncements about various "rights" with which defendants interfered, and insistence that Swearingen (not Johnson) was in the wrong, nothing in this record supports the conclusion that defendants violated clearly established constitutional rights of which a reasonable person would have known.  Defendants are plainly shielded from liability from civil damages with respect to Johnson's claims.  *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).

**C.  Other Issues and Johnson's Motion**

This court has addressed a fraction of the issues raised by Johnson because the long list of other issues were either not raised in the pleadings or are completely irrelevant to any

conceivable claim that Johnson might have brought based on her limited contacts with these defendants in August 2012.

Johnson has submitted information recounting her entire life in great detail. As revealed in bits and pieces, Johnson has a lengthy history dating back to 1991 of litigating cases in this court, both civil and criminal. Those cases involve issues as divergent as Johnson proceeding *pro se* while being prosecuted for bank robbery (*United States v. Hummasti*, Criminal Case No. 3:91-cr-00120-FR), to suing the Oregon Health Authority for failing to provide coverage for certain medical treatments (*Johnson v. U.S. Dept. of Health and Human Servs., et al.*, Civil Case No. 3:14-cv-00368-PK), to suing Portland State University and one of its professors for failing to provide assistance to students wishing to study in Israel and removing Johnson from an online class roster due to class bulletin board postings the professor dubbed as "Nazi-like anti-Arab hate speech," in contrast to Johnson's (Hummasti's) characterization of those same posts as "pro-Jewish, anti-Muslim historical and academic rhetorical position" postings (*Hummasti v. Portland State Univ., et al.*, Civil Case No. 3:05-cv-1142-MO, Complaint (docket #1), p. 3).

The submissions in the present case refer back to several of Johnson's other court cases, setting the backdrop for new and irrelevant constitutional theories. At its core, however, this case is about a handful of interactions between Johnson and three police officers. Two of those officers did nothing more than respond to calls by Johnson's neighbors and advise Johnson not to misuse the 911 system. Only Elton arrested Johnson, and he did so only upon witnessing what he believed to be criminal activity by Johnson. Their stories of the encounter basically track each other, except that Johnson claims the handcuffs were found in her headboard. Johnson also offers a laundry list of reasons as to why she had good reason to be at the apartment and why

Swearingen should have been the one arrested.  Johnson's lengthy explanations and convoluted theories give rise to no viable claim.

Johnson's Motion to Strike and for Sanctions for Fraud Upon the Court (docket #55) seeks a writ of *habeas corpus*, which is not available as she is not in custody.  It also suggests, without basis in law or fact, that this court should grant sanctions because defendants submitted perjured affidavits.  Nothing in the record supports either those accusations or the relief Johnson seeks, including the memorandum (docket #56) which Johnson submitted in support of her motion.  Accordingly, Johnson's motion should be denied.

## V.  Dismissal With Prejudice

This court previously provided Johnson with a detailed account of the deficiencies in her pleadings and allowed her an opportunity to replead and cure those deficiencies.  Order Adopting Findings and Recommendations (docket #11).  This court also advised Johnson of the standards applicable to summary judgment motions.  Summary Judgment Advice Notice (docket #45).  Nevertheless, Johnson's claims are not adequately supported either legally or factually.  It does not appear that the deficiencies in the Amended Complaint are capable of being cured by amendment, nor does it appear that the record, even viewed with every inference in Johnson's favor, supports any cognizable claim.  Therefore, dismissal should be with prejudice and without leave to file any further pleadings.

## RECOMMENDATIONS

For the reasons set forth above, Johnson's Motion to Strike Defendants' Motion for Summary Judgment and for Sanctions for Fraud on the Court (docket #55) should be DENIED; defendants' Motion for Summary Judgment (docket #39) should be GRANTED; and this case should be dismissed with prejudice.

17 - FINDINGS AND RECOMMENDATIONS

## <u>SCHEDULING ORDER</u>

The Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Monday, January 12, 2015.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## <u>NOTICE</u>

This Findings and Recommendations is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a final Judgment.

DATED December 24, 2014.

s/ Janice M. Stewart

_____
Janice M. Stewart
United States Magistrate Judge